## COFFIN–REDINGTON CO. v. PORTER.

### No. 11147.

Circuit Court of Appeals, Ninth Circuit.

May 22, 1946.

Louis S. Beedy, John Bennett King, and Thomas, Beedy, Nelson & King, all of San Francisco, Cal., for appellant.

George Moncharsh, Deputy Adm. for Enforcement, of Washington, D. C., Herbert H. Bent, Reg. Lit. Atty., and Jacob Chaitkin, Sp. Appellate Atty., OPA, both of San Francisco, Cal., for appellee.

Before GARRECHT, MATHEWS, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

This appeal is from a decree enjoining appellant from selling whisky, directly or indirectly, (1) to purchasers whose orders are accepted only on condition that they also buy other beverages or commodities, (2) at prices in excess of those set by Maximum Price Regulation 445.

The first objection urged is to the finding of the trial court that distilled spirits were sold at prices higher than the maximum permitted by the regulation, whereas the parties had stipulated that "each item, itself, was within the ceiling." However, the court found that there were tying agreements or combination sales in violation of § 7.8(b) of Regulation 445.[1] If this finding has support in the evidence, then the finding of sales at prices in excess of those allowable logically follows. We accordingly turn at once to the major contention, which is that the finding of the existence of prohibited tying agreements or combination sales is without evidentiary support.

Appellant is a wholesale liquor dealer. In 1942, owing to a scarcity of whisky, it instituted a system of allocation on the basis of previous purchases made by customers. The court found that from February to July, 1944, in addition to the allocation program, appellant had its salesmen force customers to purchase more abundant and less sought-after liquors as a condition precedent to getting any whisky. Retail customers called as wit-

---

[1] This regulation reads:

"(b) Evasion. The provisions of this regulation shall not be evaded, whether by direct or indirect methods, in connection with an offer, solicitation, agreement, sale, delivery, purchase or receipt, of or relating to any commodity, or service covered by this regulation, *alone or in conjunction with any other commodity or service* or by way of finder's fees, brokerage, com-mission, service, transportation or other charge or discount, premium or other privilege; *by tying agreement, combination sales,* or trade understanding; by requiring the buyer to purchase packaged distilled spirits or wine on a per drink basis; or in any other way. The specific enumeration of acts constituting evasion is illustrative but not exclusive." [Emphasis added.]

nesses on behalf of the Price Administrator in terms testified that they were not coerced into buying any commodity they did not want in order to get whisky, this despite the fact that prior to the trial they had given the Administrator signed statements to the contrary. However, a study of the testimony as a whole lends support to the view that, although the customers were not in so many words told that they would get no whisky if they did not give simultaneous orders for other beverages or commodities, nevertheless the attitude and conduct of the salesmen indicated that such was in fact the case— in other words, that a subtle form of coercion was practiced by the salesman, less crude, perhaps, but no less effective than forthright compulsion. For example, it is inferable from the testimony of one customer—a tavern operator—that a purchase of unwanted anchovies and liquors had to be made in order to induce appellant's salesman to take an order for whisky which the customer desired.[2] Like inferences are drawable from the testimony of other customers. The witnesses in question, although nominally testifying for the Administrator, were obviously hostile. The trial court observed their conduct and demeanor while on the stand, and was in better position than we are to appraise the situation and to draw inferences. We are not able to say that the finding in question was clearly erroneous and are therefore obliged to accept it. Columbian National Life Ins. Co. v. A. Quandt & Sons, 9 Cir., 154 F.2d 1006.

Appellant argues that in addition to establishing the existence of a tying agreement, it must be shown that the agreement illegally required the purchaser to pay more than the ceiling price for the whisky and other commodities. No evidence, it is said, was presented, as to the ceiling price of whisky or as to the aggregate sales price of the whisky and other commodities. However, no such objection was voiced in the trial court; in fact, on the trial, it was assumed by all parties that prices charged were ceiling prices as to each individual item. In the course of the trial counsel for appellant stated its contention to be "that all items were sold at the ceiling price placed upon them by the O.P.A." This statement was more than once repeated. It is not now open to appellant to attack the assumption on which it presented the case below.

We are satisfied that § 7.8(b) of Regulation 445 fairly covers the conduct shown, and we conclude that the granting of injunctive relief was warranted. Cf. Bowles v. Royal Wine & Liquor, Inc., 7

---

[2] The following excerpt from the testimony of the wife of the tavern operator is illuminating:

"Q. Now, will you tell the Court the conversation, what he [the salesman] said, what you said, and what your husband said? A. Mr. Guido walked in the door and he said, 'Good morning,' and I said, 'How are you?' And he said, 'Fine, thank you,' and he said, 'How is your husband,' and I said, 'Fine, he is in the back room,' so I called for my husband, so my husband comes in the room, into the tavern, and my husband started talking to him, and he said, 'Have you any liquor today, any whisky today?' And he says, 'Yes, but not much,' and my husband says, 'What have you got to sell?' And he said, 'We have got some anchovies.' My husband said, 'We don't need anchovies, we have no grocery store around here and this is a tavern,' and so my husband said, 'What else have you got besides anchovies?' and he says, 'Couldn't you use some anchovies?' And so my husband said, 'Where is my wife?' And he talked to me and he says, 'You can send me some.' And so my husband said 'What else have you got?' So he opened up his show case, his suitcase, and he read out what he had down in his store, and so my husband asked him, 'Have you any whiskey?' And he said, 'We are very low on whiskey.' He said at that time it was very scarce, and so he went through the list from A to Z what he thought he could sell and what we could use at the present time, and we said he had a little of everything else on the shelf, and my husband said, 'How about some whiskey.' And he said, 'Well, I can sell you half a case.' And then he made up the statement and the statement was signed and he walked out. He never had much to say."

The invoice for this transaction showed that the tavern keeper bought "one and a half cases of Red Horse Sloe Gin, two cases of Bacardi Rum Ambar Gold, two Bacardi Rum Silver White, one-half case of Havana Club Gold, and one-half case of Baret Brandy," in addition to the whisky and anchovies.

Cir., 155 F.2d 137, in which similar conduct was held to be within the scope of the regulation.

Affirmed.